**SO ORDERED.**

**SIGNED this 23 day of May,2013.**

*Stephani A. Humrickhouse*
_____
**Stephani W. Humrickhouse**
**United States Bankruptcy Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

IN RE:                                                    CASE NO.

**GREGORY & PARKER, INC.,** *et. al.*,              **12-01382-8-SWH**

   DEBTORS

### ORDER REGARDING DENIAL OF MOTIONS TO DISMISS

The matters before the court are the motions to dismiss or convert filed by Regions Bank and Georgia Capital, LLC. A hearing was held in Raleigh, North Carolina ,on March 21, 26 and April 3, 2013. Upon conclusion of the hearing, the court took the matter under advisement. On April 5, 2013, an order was entered denying the motions to dismiss. The reasons for the court's denial are set out in the instant order.

### BACKGROUND

This case involves the procedural consolidation and joint administration of two bankruptcy cases—Gregory & Parker, Inc., Case No. 12-01382-8-SWH, and Gregory & Parker-Seaboard, LLC, Case No. 12-01383-8-SWH. An order was entered on April 3, 2012, consolidating the cases and designating Gregory & Parker, Inc., Case No. 12-01382-8-SWH, as the lead case.

Gregory & Parker, Inc. ("Gregory & Parker") is a North Carolina corporation formed on October 18, 1960. William Douglas Parker, Jr. ("Mr. Parker") is president and 100% stockholder,

and Diana Lynne Parker ("Mrs. Parker"), the wife of Mr. Parker, serves as corporate secretary. Gregory & Parker-Seaboard, LLC ("Seaboard") is a North Carolina manager-managed limited liability company formed on August 16, 2004.[1] Gregory & Parker is Seaboard's sole member, and Mr. Parker serves as Seaboard's manager.

The Debtors' disclosure statement provides that Gregory & Parker historically has had a diversified business portfolio, with interests in real estate, agriculture and warehousing operations. For many years, Gregory & Parker operated warehouses in Raleigh, North Carolina, but beginning around 2005, the warehousing operations and facilities were remodeled into a 90,000 square foot retail business currently known as the Shops at Seaboard Station ("Seaboard Station"). The tenants located at Seaboard Station own and operate a variety of shops and businesses.

Although separate entities, the Debtors' pre-petition operations and bookkeeping were at least partially integrated. For example, the cash flow of each entity was separately accounted for, but the Debtors maintained a cash management system that combined all of the funds. Further, much of Seaboard's business operations, such as negotiating lease agreements associated with Seaboard Station, were being performed through Gregory & Parker.

The Debtors each filed for relief under chapter 11 of the Bankruptcy Code on February 22, 2012. Gregory & Parker's summary of schedules provides that it owns assets with an estimated total value of $2,793,614 and liabilities estimated at $18,744,754.35. Seaboard's summary of schedules shows that it owns assets with an estimated total value between $19,014,491.89 and liabilities estimated at $20,933,465.28. The Parkers filed their own chapter 11 bankruptcy case on April 25,

---

[1]For purposes of clarification, when referring to Gregory & Parker and Seaboard collectively, the court will refer to them throughout this order as the "Debtors." When referring to Mr. and Mrs. Parker collectively, the court will refer to them simply as the "Parkers."

2012.  According to their amended summary of schedules, they own assets with an estimated total value of $8,686,82.70 and liabilities estimated at $1,791,489,38.

Gregory & Parker owns the following real property: 801 Halifax Street, Raleigh, North Carolina, valued at $217,800 ("801 Halifax"); 5 West Franklin Street, Raleigh, North Carolina, valued at $400,748 ("5 West Franklin"); 518 South West Street, Raleigh, North Carolina, valued at $1,100,000 ("518 South West"); three tracts of vacant land located at 223 Barber Mill Road, Clayton, North Carolina, valued collectively at $215,390 ("223 Barber Mill"); and 807 Halifax Street, Raleigh, North Carolina, valued at $615,295 ("807 Halifax").  Seaboard also owns the following: 18 Seaboard Avenue, Raleigh, North Carolina, valued at $4,000,000 ("18 Seaboard"); 802 Semart Drive, Raleigh, North Carolina, valued at $8,000,000 ("802 Semart"); 10 West Franklin Street, Raleigh, North Carolina, valued at $4,000,000 ("10 West Franklin"); and 826 Semart Drive, Raleigh, North Carolina, valued at $3,000,000 ("826 Semart").

In addition to the Debtors, the Parkers themselves own a fairly significant amount of real property: 12025 Cleveland Road, Garner, North Carolina, valued at $4,163,450 ("Cleveland Road"); an approximately 263 acre tract commonly known as Galilee Road Farm, valued at $778,970 ("Farm"); property labeled as "Old Drug Store Road," valued at $689,760 ("Drug Store"); 387 Old Drug Store Road, valued at $181,730 ("387 Drug Store"); 405 Old Drug Store Road, valued at $186,180 ("405 Drug Store"); 425 Old Drug Store Road, valued at $82,440 ("425 Drug Store"); 373 Old Drug Store Road, valued at $102,310 ("373 Drug Store"); a 43 acre tract known as Middle Creek, valued at $37,020 ("Middle Creek"); a 7.94 acre tract labeled as NC 1010/Barber Mill, valued at $81,900 ("Barber Mill"); 225 Barber Mill, valued at $520,900 ("225 Barber Mill"); 223

3

Barber Mill, valued at $178,880 ("223 Barber Mill"); and 143 Christine Drive, Garner, North Carolina, valued at $130,480 ("143 Christine Drive").[2]

Some, but not all, of these properties are encumbered by liens. Regions Bank ("Regions") has filed a proof of claim in all three bankruptcy cases, with each claim in the amount of $19,075,095.14. The claims are based on a promissory note executed by Seaboard in favor of Regions in the original amount of $13,500,000. As of December 18, 2012, the amount owed on the note was $13,180,697.96. Regions also claims that it is owed $5,894,397.18 pursuant to an ISDA Master Agreement ("SWAP Agreement") entered into between it and Seaboard. The bank's claims are secured by the retail properties located at Seaboard Station and the rents generated therefrom. Finally, Seaboard's obligations to Regions are also personally guaranteed by both the Parkers and Gregory & Parker.

Georgia Capital, LLC ("Georgia Capital") has filed a proof of claim in Gregory & Parker's case in the amount of $4,006,762.74 and a claim in the Parkers' case in the amount of $4,186,317.33. Its claim is based on two promissory notes both of which were executed by Mr. Parker. As of February 25, 2013, the total amount owed on both notes was $5,008,783.35, consisting of $3,950,000 in principal plus $1,135,474.64 in interest, less $76,691.29 of reserves held. The bank's notes are secured by the Debtors' properties located at 518 South West, 801 Halifax, 807 Halifax, 5 West Franklin, and 826 Semart, as well as the Farm and Cleveland Road that are owned by the Parkers individually.

---

[2]The values of the Debtors' and Parkers' properties indicated are taken from the schedules filed by each debtor.

Regions and Georgia Capital are by far the largest secured creditors in these cases, although other secured claims do exist. Such claims include the secured claim of JDavis Architects, PLLC in the Seaboard case in the amount of $94,502.46 and that of Four Oaks Bank filed in the Parkers' case for approximately $1,380,960.14. Both priority and general unsecured claims have also been filed in all three cases, the largest of which is the general unsecured claim of Conan McClain ("Mr. McClain"), excluding any deficiency claim held by Regions. Mr. McClain has filed two proofs of claim in all three bankruptcy cases, with the first claim for $1,498,903.14 and the second claim for $345,350.

The Debtors filed a joint plan of reorganization on November 2, 2012, and the Parkers filed their own plan on November 8, 2012.[3] The Debtors' plan creates eleven classes of claims. The Debtors indicate that the class containing the secured claim of JDavis Architects and that of the general unsecured trade debt will constitute their impaired accepting classes. The plan treats Regions's claim as secured up to $13,302,755.71 and treats Georgia Capital's claim as secured up to $4,533,637.32. It proposes, in pertinent part, to pay each claim over a twenty-five year amortization period at 3.25% interest with a five year call. The Debtors propose no payments on account of the $5,570,941.51 that Regions alleges it is owed based on the SWAP Agreement. Finally, the plan treats Mr. McClain's allowed claims, if any, as general unsecured claims of an insider and proposes to pay such claims only after all allowed claims within other classes of creditors have been paid in full.

---

[3]On May 4, 2013, subsequent to the order denying the instant motions to dismiss or convert, the Debtors filed an amended plan and disclosure statement. The amended plan appears to be a fully liquidating plan. However, the order denying the motions and the instant memorandum opinion are based on the plan that was filed with the court as of the date of the hearings on such motions and the circumstances of the cases existing at that time.

The Parkers' plan creates thirteen classes. Its success is ultimately dependent on the success of the Debtors' plan. In pertinent part, it provides that the claims of Regions, Georgia Capital and JDavis Architects will all be paid in accordance with the Debtors' plan and, upon confirmation of the Debtors' plan, the Parkers will be discharged from all debts arising from such claims. The plan also proposes to pay any remaining portion of Mr. McClain's allowed claims to the extent they are not paid through the Debtors' plan. The plan proposes to satisfy Four Oaks Bank's claim, a fairly significant secured claim against the Parkers' estate, by liquidating enough property to pay it in full.

After filing their plans of reorganization, the Debtors and the Parkers filed objections to certain claims in their respective cases. The Debtors, on March 5, 2013, and the Parkers, on March 6, 2013, filed objections to both of Mr. McClain's claims. On March 9, 2013, the Debtors filed an objection to Georgia Capital's claim. On March 11, 2013, the Debtors objected to the $5,894,397 portion of Regions' claim related to the SWAP Agreement. Seaboard has also objected to certain general unsecured claims filed in its case. In addition to these objections, the Debtors and the Parkers, as co-plaintiffs, filed a complaint against Mr. McClain on March 25, 2013, asserting causes of action for preferences, fraudulent transfers, breach of fiduciary duty, constructive fraud, guarantor liability, conversion, and unfair and deceptive trade practices. Mr. McClain had previously filed his own complaint against the Parkers objecting to their discharge.

During the bankruptcy proceedings in their cases, the Debtors have incurred fairly significant administrative expenses that are primarily associated with professional fees. These fees include those of the Debtors' general bankruptcy counsel, accounting fees of Adams, Martin & Associates, and consulting fees of Capital Associates. Gregory & Parker also paid at least $15,000 in fees to Business Debt Solutions, Inc. ("BIZCAP") for assistance in obtaining alternative sources of

6

financing.  Finally, the Debtors have expended amounts on legal fees related to the claim objections and pending adversary proceedings.

Regions and Georgia Capital filed the instant motions, along with Mr. McClain's response in support thereof, arguing that cause exists under § 1112(b) to dismiss or convert the cases. Testimony was provided during the hearing from Mr. and Mrs. Parker, Mr. Bret Muller with Capital Associates, and Ms. Sarah Armstrong with Adams, Martin and Associates.  Upon conclusion of the hearing, counsel for the Bankruptcy Administrator stated that he supported the banks' motions to convert or dismiss the Debtors' cases.  However, as an alternative, he suggested that the appointment of a chapter 11 trustee may be the most appropriate remedy.

## DISCUSSION

Subject to certain exceptions, § 1112(b)(1) provides that a court shall dismiss a case under chapter 11 or convert the case to one under chapter 7, whichever is in the best interests of the creditors and the estate, if the party moving for conversion or dismissal establishes "cause." 11 U.S.C. § 1112(b)(1).  The Code provides a non-exhaustive list of sixteen different acts, omissions or other circumstances that constitute "cause" for dismissal or conversion.   11 U.S.C. § 1112(b)(4)(A)-(P).  A court may exercise its discretion in deciding whether other grounds exist to dismiss or convert the case.  See In re Tosh, 2012 Bankr. LEXIS 5828, at *5 (Bankr. E.D.N.C. Dec. 19, 2012) ("[T]he enumerated list in §1112(b) is not exclusive and the decision to convert or dismiss a case remains within the discretion of the court."); In re BH S&B Holdings, LLC, 439 B.R. 342, 346 (Bankr. S.D.N.Y. 2010) ("Bankruptcy judges have wide discretion to determine whether cause exists to dismiss or convert a case under section 1112(b).").  Once "cause" is established, conversion or dismissal is mandatory, unless an exception set out in § 1112(b)(1) applies.  11 U.S.C.

§ 1112(b)(1) ("The court *shall* convert . . . or dismiss a case . . . if the movant establishes cause.") (emphasis added).  The party moving for conversion or dismissal has the burden to establish "cause" by a preponderance of the evidence.  In re Forbes Transp., LLC, 2009 Bankr. LEXIS 841, at *3 (Bankr. E.D.N.C. Apr. 2, 2009) (citing In re Woodbrook Associates, 19 F.3d 312, 317 (7th Cir. 1994)).

In its motion, Regions argues that cause exists because there is a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A).  Georgia Bank's motion simply supports and reiterates the contentions asserted by Regions.  During closing arguments, counsel for Regions contended that "cause" also exists because of the Debtors' inability to effectuate a feasible plan and unreasonable delay by the Debtors that is, or has been, prejudicial to the creditors.

The court finds that the movants have not satisfied their burden of establishing the two-pronged test under § 1112(b)(4)(A).  In re BH S&B Holdings, LLC, 439 B.R. at 347 ("A party seeking to demonstrate cause under section 1112(b)(4)(A) must establish both the 'substantial or continuing loss' prong as well as the absence of a reasonable likelihood of rehabilitation prong."). The first prong of this test generally focuses on whether "the debtor has suffered or continued to experience a negative cash flow, or, alternatively, declining asset values." In re Landmark Atlantic Hess Farm, LLC, 448 B.R. 707, 713-14 (Bankr. D. Md. 2011) (citing In re Westgate Properties, 432 B.R. at 723)); see also In re Motel Props., 314 B.R. 889, 894 (Bankr. S.D. Ga. 2004) ("Courts have held that a post-petition negative cash flow and an inability to satisfy current expenses constitute a loss to or diminution of the estate.").  The second prong looks to whether the debtor lacks a reasonable likelihood of reestablishing itself "on a firm, sound basis." See In re Westgate

8

Properties, Ltd., 432 B.R. 720, 723 (Bankr. N.D. Ohio 2010) (""[R]ehabilitation does not necessarily denote reorganization, which could involve liquidation.  Instead, rehabilitation signifies something more, with it being described as to put back in good condition; re-establish on a firm, sound basis.") (quotations and citations omitted).

Regarding the first prong of the standard, there was not much, if any, evidence on the Debtors' post-petition cash flow or, more specifically, on Seaboard's cash flow as the primary income producing entity.  However, the court has examined the Debtors' monthly reports for guidance.  Even after reviewing such documents, it is unclear whether the company has suffered from a substantial or continuing negative cash flow since filing bankruptcy.  The reports show that Seaboard's post-petition operating account has accumulated a fairly significant amount of cash, mostly from rental income and TICAM reimbursements.  Based on this information, it appears that Seaboard has experienced a positive post-petition cash flow, even while making monthly adequate protection payments to both Regions and Georgia Capital and paying most of its administrative expenses, including professional fees.

While Seaboard's operating account indicates a positive cash flow since filing, the company's post-petition net operating income is less clear.  Based on its profit and loss statements contained in the monthly reports, Seaboard has experienced positive net operating incomes for March 2012, April 2012, June 2012, July 2012, August 2012, September 2012 and February 2013, but negative ones in May 2012, October 2012, November 2012, December 2012 and January 2013.  Such statements may not be true indicators of financial stability, however, because they contain non-cash accounting entries such as depreciation.  Thus, even after reviewing the monthly reports, the

court cannot find that Seaboard has in fact suffered a substantial or continuing negative cash flow since filing bankruptcy.

The court is also unpersuaded that the Debtors' assets have suffered a substantial or continuing decline in value. Counsel for Mr. McClain argued at the hearing that the reduced rent rates for certain tenants negatively affect the value of Seaboard Station. Counsel attempted to elicit evidence in support of such arguments through cross-examination of Mr. Muller. However, Mr. Muller adamantly refused to accept the assertion that Seaboard Station's market value has declined because of the new rent rates, stating that there are many different variables affecting the value of income-producing real estate. Mr. Muller actually stated at one point during his testimony that he held a positive outlook on the value of commercial property such as Seaboard Station. There was no evidence, or even allegation, that properties owned by the estates other than Seaboard Station were declining in value. Without more, the movants have not established that any of the estates' assets have diminished in value since filing bankruptcy. Accordingly, the court concludes that the movants have not satisfied their burden of presenting sufficient evidence during the hearing to establish the first prong of the test under 11 U.S.C § 1112(b)(4)(A).

Even if the movants had established the first prong of the test, the court was unpersuaded that the Debtors lacked a reasonable likelihood of rehabilitation.[4] The evidence presented during the hearing indicated that the Debtors are on a much stronger basis financially than before filing

---

[4]Based on the testimony and representations made by counsel during the hearing, the Debtors indicated their intention to maintain operations at Seaboard Station even if it was necessary to liquidate other non-income producing properties to satisfy certain claims. As set forth in footnote 3 herein, the Debtors have recently filed an amended plan which purports to be a fully liquidating plan. While such a change in circumstances would have affected the court's analysis as to the second prong of the test under § 1112(b)(4)(A), it would not have changed the outcome because of the movants failure to establish the first prong of the test.

bankruptcy. With the assistance of certain professionals, the Debtors' have organized and virtually reconstructed their financial records, records that Ms. Armstrong testified were in "shambles" prior to bankruptcy. The Debtors have also stabilized their income and expenses. They have successfully negotiated lease renewals with existing tenants at Seaboard Station and have had more success, with some assistance from Capital Associates, in collecting those rents. The Debtors have instituted a new policy on tenant reimbursements for TICAM expenses, and Ms. Armstrong testified that this should mitigate the Debtors' burden of paying such expenses. The administrative expenses incurred thus far throughout the bankruptcy will likely decrease significantly in the near future. For example, as Ms. Armstrong testified, the accounting fees of Adams, Martin & Associates should decrease substantially now that the bulk of the work on the Debtors' financial records has been completed. Finally, the Debtors' management has improved its overall relations with the tenants, which, if anything, should have a positive effect on the Debtors' operations. Based on the evidence presented during the hearing, the Debtors appear to be reestablishing themselves on a sound basis. Therefore, the movants have not satisfied the second prong of the test under § 1112(b)(4)(A).

The movants argue that even if § 1112(b)(4)(A) is not satisfied, "cause" nevertheless exists to dismiss or convert the cases because the Debtors lack the ability to effectuate a feasible plan. A threshold issue would ordinarily be whether to recognize "inability to effectuate a feasible plan" as an independent ground for dismissal or conversion when it is not included within the enumerated list set out in § 1112(b)(4)(A)-(P). It was once explicitly recognized as "cause" for dismissal or conversion under § 1112, until Congress eliminated it from the list with the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). See In re TCR of Denver, LLC, 338 B.R. 494, 497-498 (Bankr. D. Col. 2006) (comparing language of § 1112 pre-BAPCPA with

11

its language post-BAPCPA and highlighting the differences); In re DCNC N. C. I, LLC, 407 B.R. 651, 664-65 (Bankr. E.D. Pa. 2009) (recognizing that BAPCPA deleted inability to effectuate a feasible plan from list defining "cause" under § 1112) (citing In re 3 Ram, Inc., 343 B.R. 113, 118 n. 14 (Bankr. E.D. Pa. 2006)).[5]  Assuming, however, that an "inability to effectuate a feasible plan" may in and of itself constitute "cause" for dismissal or conversion, the movants have not satisfied their burden of showing that such a basis exists in the instant cases.

Significantly, the Debtors and the Parkers have property, other than Seaboard Station, that may be liquidated to satisfy certain claims against the estates.  For example, counsel for the Parkers indicated that the property securing the claim of Four Oaks Bank will be liquidated to satisfy most, if not all, of that claim.  In support of this representation, Mr. Muller testified that the bank's claim would likely be satisfied in full from the sale of its collateral, depending on how the property was sold.  It also became clear that the estates intend to liquidate sufficient property in satisfaction of Georgia Capital's claim.  Mr. Muller also testified that Georgia Capital's claim should be fully satisfied after the sale of some, if not most, of the bank's collateral, with proceeds possibly remaining depending on how the property was sold.  It was therefore evident from the hearing that the estates were intending to, and would likely be able to, satisfy two out of the three largest secured claims by liquidating collateral.

---

[5]During closing arguments, Regions relied on In re DCNC N.C. I, LLC to argue that inability to effectuate a feasible plan has been recognized as an independent ground for dismissal.  407 B.R. 651 (Bankr. E.D. Pa. 2009).  However, the debtors in In re DCNC N.C. I were non-operating entities.  Id. at 651 (citing In re 3 Ram, Inc., 343 B.R. at 118 n. 14).  As recognized by the court in In re 3 RAM, a case relied upon by the court in In re DCNC N. C. I, the applicable standard for a debtor who is an operating entity will ordinarily be the two-prong test under § 1112(b)(4)(A). 343 B.R. at 118 n. 14.

With these secured claims satisfied, the Debtors intended to cash flow Regions's claim through income produced by Seaboard's operations. Ms. Armstrong testified that the income generated should be sufficient to satisfy Regions's $13,302,755.71 claim. This amount, however, does not take into account the $5,570,941.51 Regions alleges it is owed based on the SWAP Agreement. The cash flow projections submitted by the Debtors at the hearing also do not take into account the claims of Mr. McClain. Such claims are not provided for because of the Debtors' assumption that they will prevail on their claim objections. Regions asserts that the failure to account for such claims in the plan or the cash flow projections reveals impediments to the Debtors' ability to effectuate a feasible plan.

Specifically, Regions argues that, with no alternative sources of financing, the Debtors' ability to effectuate a feasible plan hinges on the outcome of their claim objections. According to Regions, a showing that a plan's feasibility is dependent on the outcome of litigation, litigation that could be drawn out for years, is sufficient to constitute "cause" for dismissing or converting the case. In support of its argument, Regions relies on the case of In re DCNC N.C. I, 407 B.R. 651 (Bankr. E.D. Pa. 2009).

In In re DCNC N.C. I, the debtors were entities that served as real estate "development vehicles." 407 B.R. at 655. Since filing bankruptcy, the debtors had been unable to obtain necessary funding for the continued construction of their development projects. Id. at 659. As a result, they could operate or generate any income post-petition. Id. The major secured creditor brought a motion to dismiss the case based on the debtors' inability to effectuate a plan. The court reasoned that the success of the debtors' reorganization, and the feasibility of their plan, depended entirely on two possibilities—the debtors prevailing in a state court action against the secured

13

creditor, which had already been dismissed on the merits with an appeal pending, or, alternatively, refinancing of the secured creditor's debt.  Id. at 667-70.  Without either, it was clear to the court that the debtors would be unable to effectuate a feasible plan.  Because both scenarios were very unlikely, the court dismissed the case.  Id. at 70.

The debtors' circumstances in In re DCNC N.C. I are distinguishable from those of the Debtors in the instant case.  The critical difference is that the Debtors' ability to effectuate a feasible plan, or their ability to achieve a successful rehabilitation, does *not* depend entirely on the outcome of their claim objections, specifically those of Regions, Georgia Capital and Mr. McClain.  Unlike the debtors in In re DCNC N.C. I, the Debtors are maintaining operations and generating income post-petition, income that has so far been sufficient to satisfy current operating expenses, make monthly adequate protection payments, pay rather significant administrative expenses, and accumulate some cash reserves.  The Debtors and the Parkers also have the ability, and have expressed an intent, to liquidate non-income producing property to satisfy at least two of the largest secured claims in their cases.  A feasible plan may be effectuated by a combination of the income produced from Seaboard's operations and the liquidation of other properties, even if the Debtors do not prevail on their claim objections.[6]

As a component of its argument that the Debtors are unable to effectuate a feasible plan, Regions contends that the plan does not provide for alternative treatment in the event the Debtors are unsuccessful in their objections.  To be confirmable, as Regions argues, the plan needs to provide

---

[6]In support of its argument that the Debtors lack the ability to effectuate a feasible plan, Regions contends that the Debtors have not taken into account the possibility of substantial capital gains taxes arising from the liquidation of certain collateral.  The movants introduced no evidence on this issue beyond speculation of counsel and thus the court could not assess the impact of capital gains taxes on the ability to effectuate a feasible plan.

14

for such alternative treatment.  At confirmation, given the magnitude of the disputed claims, the Debtors will likely need to demonstrate that their plan will be feasible even if their claim objections are denied.  However, this issue is more appropriately addressed in the context of plan confirmation.  As previously stated, there is not enough evidence for the court to conclude that the Debtors lack the ability to fund a feasible plan even assuming some or all of the claim objections are unsuccessful.  Accordingly, the court will not dismiss or convert the cases at this juncture simply because the current plan of reorganization fails to provide for alternative treatment.

Regions argues that it would be nearly impossible for a movant to satisfy its burden of showing that a debtor is incapable of effectuating a feasible plan if the debtor can defeat the motion simply by stating that it intends to file an amended plan that will address concerns over feasibility.  The court disagrees.  If a case is one that should be dismissed for cause, either under 11 § U.S.C. 1112(b)(4) or solely because of the inability to effectuate a feasible plan, the moving party should be capable of demonstrating that such cause exists regardless of whether a plan has been filed or whether the debtor intends to modify or amend an existing plan.  For example, a significant or continuous post-petition loss to the estate, or, alternatively, an inability to satisfy one of the provisions of § 1129(a) (such as the failure to obtain an impaired accepting class), usually cannot be cured with plan amendments.  Such circumstances do not exist in the instant cases, however, and the proffered defects regarding feasibility of the Debtors' plan, including possible treatment of the SWAP Agreement debt, may be cured through proper amendments.

Finally, Regions asserts a third ground for dismissal—delay prejudicial to creditors.  The court, however, does not find that there has been any unreasonable delay by the Debtors resulting in actual prejudice to the creditors.  The Debtors, with the assistance of certain professionals, have

worked diligently to reorganize all aspects of their business, ranging from the financial records to the overall relations with the tenants of Seaboard Station.  See In re Sheehan, 58 B.R. 296, 300 (Bankr. D. S.D. 1986) (finding no unreasonable delay when debtors were not abusing the bankruptcy process and were working diligently to formulate a plan).  They have done so while maintaining adequate protection payments to their largest secured creditors.  Although these cases have been in bankruptcy for just over one year, the court does not find that this extended time period has been the result of any unreasonable delay or dilatory tactics by the Debtors.

In sum, the court finds that the movants have failed to satisfy their burden of showing that cause exists under 11 U.S.C. § 1112(b) to dismiss or convert the Debtors' cases.  Therefore, the motions to dismiss or convert are hereby **DENIED.**

**SO ORDERED**.

**END OF DOCUMENT**